AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

2019 MAR 12  PM 1: 15

| In the Matter of the Search of | )
| *(Briefly describe the property to be searched* | )
| *or identify the person by name and address)* | )
| INFORMATION ASSOCIATED WITH | )
| precisionmetalscorp@gmail.com, precisionmetalsinc@gmail.c | )
| om, ammettc1@gmail.com, ammett2324@gmail.com, | )
| ammetshipping@gmail.com,  AND THAT IS STORED AT | )
| PREMISES CONTROLLED BY Google, Inc. | )

Case No.  2:19 mj 192

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 287 | False Claims |
| 18 U.S.C. § 38 | Fraud involving Aircraft Parts |

The application is based on these facts:

See attached affidavit.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Delia McMullen, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 12, 2019

City and state: Columbus, OH

*Judge's signature*

Kimberly A. Jolson   U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
precisionmetalscorp@gmail.com,
precisionmetalsinc@gmail.com,
ammettc1@gmail.com,
ammett2324@gmail.com,
ammetshipping@gmail.com, AND THAT IS
STORED AT PREMISES CONTROLLED
BY Google, Inc.

Case No.  2:19 mj 192

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Delia McMullen, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application for a search warrant for

information associated with certain accounts that are stored at premises controlled by Google,

Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View,

California 94043.  The information to be searched is described in the following paragraphs and

in Attachment A.  This affidavit is made in support of an application for a search warrant under

18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the

government copies of the information (including the content of communications) further

described in Section I of Attachment B.  Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B.

2.       I am a Special Agent with the Defense Criminal Investigative Service (DCIS),

which is part of the Office of the Inspector General for the U.S. Department of Defense (DoD).  I

have been so employed for approximately 16 years. In my current capacity, I am charged with investigating acts of suspected DoD contract fraud.

3.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, to wit: Section 1001 (making false statements); Section 1343 (wire fraud); Section 287 (making a false or fraudulent claim against the U.S); and Section 38 (fraud involving aircraft parts) have been committed by **Am-Met Corporation, Military Defense Systems Inc. (MDS)**, **Robert O. Klein**, **John Amos** and other unknown persons and companies. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

*Contracting Process*

6.     The United States Department of Defense (DoD), contracts through its various agencies, such as the Defense Logistics Agency (DLA). DLA is the United States' combat logistics support agency, and as such manages the global supply chain for all military services, 10 combatant commands, other federal agencies, and partner and allied nations. DLA has three

2

primary depots that manage the military's global supply chain – DLA Land and Maritime (L&M) in Columbus, Ohio, DLA Aviation in Richmond, Virginia, and DLA Troop Support (TS) in Philadelphia, Pennsylvania.

7.      When the DoD determines that a particular part is needed, the DoD issues "Solicitations," or Requests for Quotation (RFQs) electronically through a web-based application, DIBBS (DLA's Internet Bid Board System).  Users (potential contractors) are able to search for, view, and submit secure quotes based upon the RFQs for the items DLA is looking to obtain.  The solicitations (RFQ's) list the DoD requirements, which can include drawings and/or specifications such that any potential contractor is aware of exactly how the part is to be made or where they can obtain the part.  DoD contractors are required to have a quality control system in place to insure the parts supplied to the DoD are in accordance with DoD drawings and specifications.  In addition to noting the contractor's agreement or disagreement with the requirements of the solicitation, the quote, or bid, submitted will list the contractor name, business location and an email address.

8.      In order to conduct business with the DoD, contractors must register in the System for Award Management (SAM), to include providing an email address, and agree to receive payments electronically.  The contractors must also obtain a Commercial and Government Entity (CAGE) code.  The CAGE code is a 5-character identification number used extensively within the federal government, assigned by the DLA.  The CAGE code is used to support a variety of mechanized systems throughout the government and provides a standardized method of identifying a given contractor facility at a specific location.

9.      In the contracting process, once parts are shipped to the DLA, contractors enter the shipping and invoicing information electronically, through a secure, web-based system,

which allows the government to receive and pay electronically. Upon receiving the invoice, the DoD, through the Defense Finance and Accounting Service (DFAS), Columbus, Ohio; in the Southern District of Ohio, will issue electronic payment to the supplying contractor and retain a voucher as a record of the payment.

10.     DLA L&M in Columbus is also home to laboratories used to test and identify nonconforming parts sold to DLA, including the capability to test for counterfeit material, substitute inferior products, and remark/over brand items. These laboratories at DLA L&M are used to test all suspect parts provided to DLA worldwide.

*Background of the Investigation*

11.     This investigation dates back to at least 1997 and involves a group of individuals that have been defrauding DLA by providing defective replacement parts for U.S. military weapon systems. The scheme to defraud involves setting up a company for the purpose of bidding, often the lowest bid, on DLA contracts via DIBBS. When awarded a DLA contract, the company provides defective parts to the DLA, but submits an invoice certifying their compliance with the contract, which then leads to payment before any of the bad parts can be detected. Once a company is discovered providing bad parts, it is debarred and a new company is formed to take its place.

12.     During the last 15 years, DLA L&M has identified approximately 50 companies selling bad parts (primarily through part testing) and debarred each company and its principals. It also appears that each subsequent company established may be using fake or false names for its owners or principals to avoid detection.

13.     Over time, there has been an effort to identify and link together many of the companies and their principals through same or similar addresses, phone numbers and employee

4

names.   The addresses and phone numbers of the companies involved have spanned several states, including Colorado, Texas, Florida, Louisiana and Mississippi.  Additionally, the addresses have often been empty lots, vacant buildings, or non-existent, and the companies appear to have had little to no manufacturing ability.

14.    The most recent iterations of companies used by this group are **Military Defense Systems Inc. (MDS)** and **Am-Met.**  Prior iterations include:

a.  JN&N Inc., Advanced Technology, Fluid Devices Ltd., Advance Technologies Ltd., Charles T. Pace, and Bron Lee Strokes, all of which were debarred in December 2003 for three years for providing defective parts to the DLA on contracts issued as early as 1997;

b.  Transwestern Resources Corporation, George Pattison, Advanced Technologies, Sunpool Manufacturing Company, Sara Steihl, Robert Steihl, Linda Lee, JN&N, and Charles Pace, all of which were debarred in November 2010 for 10 years for providing defective parts to the DLA;

c.  Eurometals SA Ltd., Skyvara Foundry Ltd., Herbert Harvey, Claude Bernard, Richard Skyvara, and Bernard Skyvara, all of which were debarred in August 2011 for three years for providing defective parts to the DLA;

d.  Zero Recoil Factors Inc., Metal and Machine Institute Inc., and TNT Engineering Ltd., all of which were debarred in May 2012 for three years for being affiliated with previously debarred companies;

e.  Omni Tec LLC and Nolen Materne, which were debarred in March 2013 for three years for being affiliated with previously debarred companies;

f.   Burch Technical Institute, Cameron Duchman, and Clinton Gibson, all of which were debarred in August 2013 for three years for being affiliated with previously debarred companies;

g.   Highlands Manufacturing Institute and William Teach, which were debarred in October 2013 for an indefinite period for being affiliated with previously debarred companies;

h.   Stealth Equipment Instructor Inc. and William Smith, which were debarred in November 2013 for an indefinite period for being affiliated with previously debarred companies;

i.   Ace Service and Supply Corp, Howard Stein, Eric Stein, and Mark Gold, all of which were debarred in 2014 for providing defective parts to the DLA; and

j.   Sydabon Mfg. Inc., Bena Lobe, Leonard Lobe, Dalton Reme, Russel Thurston, Lela Thurston, Sydabon Manufacturing Co., **John Amos**, Debra Namias, and **Robert Klein**, which were debarred in 2014 for three years for providing defective parts to the DLA.

*Targets – Individuals*

15.   Although it appears several of the individuals associated with the fraudulent companies are fake names, **John Amos** and **Robert O. Klein** are two names that are consistently related to the debarred companies and believed to be actual people.

16.   Specifically, the evidence indicates that **Amos**, born in 1934, and **Klein**, born in 1937, have been operating companies engaged in DoD contracting fraud, to include owning and managing **MDS**. Both targets reside in the New Orleans, LA area; though at least **Klein** may also have secondary residence or property in Colorado. On January 9, 2019, DCIS agents

6

interviewed two former employees of **MDS**, both of whom positively identified **Amos** and **Klein** in unmarked driver license photographs.

17. Both former employees also confirmed that **Klein** was the owner of **MDS** and **Amos** was the manager. The former employees explained that Chad Myers also regularly works for **Klein**; Myers setup and maintains IT equipment at **Klein's** primary business office and manages Klein's largest customer, DoD contractor JBL System Solutions LLC (JBL). **Amos** actually admitted to one of the former employees that **Klein** used fake names for the owner(s) of some of his businesses. **Amos** said that **Klein** was the real owner of **MDS**, and Ada and Bryan Wolfe, the purported owners of the company, were fake names used by **Klein**. **Klein** disputed this allegation to the employee, but **Amos** explained that **Klein** used fake names because neither he nor **Amos** could represent **MDS** as both were debarred. **Amos** also admitted that **Klein** hired an actor once to play the role of Bryan Wolfe at an inspection conducted in connection with a DLA contract for which MDS was providing parts.

18. **Amos'** connection to the debarred companies is significant as there is evidence of:

    a. his signature on Certificates of Conformance received from Machine Institute, Zero Recoil, and Transwestern;

    b. his employment at Transwestern as evidenced by two Corrective Action Request (CAR) letters from the Defense Contract Management Agency (DCMA) addressed to **Amos;**

    c. his listing as the registered agent for Southwest Engineering, Ltd. which is an alternate name used by TNT Engineering (currently debarred as an affiliate of Transwestern); and

    d. his listing as the registered agent of Sydabon Manufacturing Ltd.

19.     **Klein** also has a strong connection to the debarred companies, as follows:

    a.   he was identified as a principal of JN&N in a trip report by a contracting officer documenting a meeting at the company, which took place on January 18, 2002;

    b.   he also submitted quotes and responded to correspondence on behalf of JN&N;

    c.   he appears to have purchased Transwestern in January 2010; and

    d.   his name was at the top of documents faxed to a DLA L&M contracting officer in 2011 by Eurometals.

*Target Companies*

**MDS**

20.     On January 19, 2015, soon after Sydabon and related entities were debarred, **MDS** was registered in SAM to do business with the government.  The physical address initially listed was 11030 Chef Menteur Highway, New Orleans, Louisiana 70124.  In or around January 2017, **MDS**' physical address was changed to 1817 Palestine Road, Picayune, Mississippi 39466.  Throughout this time, Ada Wolfe was identified as the President of **MDS**, Bryan Wolfe as the Accounts Receivable Point of Contact (POC) and Government Business POC, and Donald Wolfe as the Electronic Business POC.  The sole email address entered for all three of these contacts was the subject email, military_defense_systemsinc@yahoo.com.

21.     On December 27, 2018, your affiant queried Mississippi's Secretary of State website for **MDS**, which showed that **MDS** was not incorporated until December 2, 2015.  The Incorporator is listed as Robert Klein at 313 Tully Street, Picayune, MS 39466.

22.     On January 10, 2019, DCIS agents visited the address of 313 Tully Street, Picayune, MS 39466, and learned that it was a business that provides mailboxes and other mail services.  Agents interviewed the Business Manager, who advised that Robert O. Klein had

8

opened a mailbox there several years earlier. A review of records provided by the manager revealed that this Robert O. Klein had a birthdate matching **Klein**, who is a subject of this investigation.

23.     During 2015-2016, **MDS** received approximately $449,000 in DLA contracts. DLA L&M tested parts, some critical application items, from 11 different DLA contracts received by **MDS** and all parts failed. Based on these failures, in July 2018, DLA debarred **MDS** and its three principles (suspected to be fake names) – Ada, Bryan and Donald Wolfe. These 11 contracts are valued at approximately $85,000. MDS invoiced the DoD and received payment for these contracts. A critical application item is an item on a U.S military weapon system that is essential to the weapon's performance, operation, and/or the preservation of life or safety of operating personnel.

24.     In its bids for the above 11 contracts, **MDS** certified to DLA that it was the manufacturer for the parts it was quoting to DLA, and that it would manufacture parts in accordance with the appropriate drawings and specifications. The email address entered for each bid was military_defense_systemsinc@yahoo.com.

25.     Finally, there are instances of interactions between DLA, DCMA and other contractors that suggest **MDS** is not a legitimate company doing business with the DoD. For example, in addition to bidding on their own contracts, **MDS** allegedly also provided parts as a subcontractor to other government contractors for use by the military. In December of 2016, a Quality Assurance Representative (QAR) from DCMA reached out to JBL regarding their use of **MDS** as a subcontractor on a DLA Aviation contract. Specifically, the QAR noted in an email to officials at JBL that the facility of manufacturer mentioned in the contract (**MDS**) does not exist; he went on to explain that the address listed of 11030 Chef Menteur Highway (which was also

9

the address listed in SAM for **MDS**) is Diesel & Hydraulic Services Co., Inc. In fact, the QAR noted in the email that when he entered the facility in 2015, no one inside knew of a company called Military Defense Systems either.

26.     In January of 2017, JBL notified a DLA contracting officer that **MDS** had changed its location to 1817 Palenstine Road, Picayune, MS 39466. Two QARs actually went to the location at the end of January 2017 to conduct an inspection. In an email after the completion of the inspection, one of the QARs wrote that, in part, that "[t]he individual in charge identified himself as John Amos and he confirmed that this was in fact Military Defense Systems and stated that they were in the process of moving from Chef Hwy in New Orleans. He also stated that the work they were doing wasn't for the government. Long story short these guys can't manufacture anything in the current state of the facility. There is no power or water to the building. They were using a little portable generator to power the hot knife to seal the stuff they were packaging...they were a couple pieces of equipment, two drill presses and 4 lathes that in all honestly looked more like they were abandoned rather than brought in. I expressed my concern about there being no capability to meet the requirements of our three contracts. Mr. Amos said he would have Mr. Wolf, the company VP, contact me..." The QAR also noted that his co-inspector recognized **Amos** as the same individual who would present product for inspection to DCMA on behalf of Eurometals, which was debarred in October of 2011. To follow up on the possible involvement of a debarred Mr. Amos with **MDS**, in April of 2017 a contracting officer reached out to JBL for confirmation that the Mr. Amos that was present for the inspection was not the excluded or debarred Mr. Amos affiliated with Eurometals. JBL responded and attached an email between JBL and Bob Klein with **MDS** at the subject email address of military_defense_systemsinc@yahoo.com, wherein JBL noted a prior phone call with

Bob Klein confirming that Mr. Amos is not the excluded John Amos. JBL asked for the same verbal confirmation to be put in an email. Klein responded and wrote, in part, "Confirmed. Regards, Bob Klein Military Defense Systems."

**AM-MET**

27.     On March 30, 2017, **Am-Met** was registered in SAM to do business with the government. The physical address initially entered for SAM was 166 Thompson Road, Suite 2, Houma, Louisiana 70363. Rex Larue was identified as the Owner of **Am-Met**, Trinity Cuevas as the Accounts Receivable Point of Contact (POC), Electronic Business POC and Government Business POC. The sole email address entered in SAM for **Am-Met** is ammetqra@gmail.com.

28.     **Am-Met** established its CAGE code in April of 2017 and as of December 2017, listed its POC as Rex Larue at 212 Gemini Court, Houma, LA 70360. A review of **Am-Met's** CAGE code information in December of 2018 revealed that Trinity Chauvin is now listed as the POC and the address is 166 Thompson Rd., Suite 2, Houma, LA 70363 (which matches the address listed in SAM).

29.     On January 9, 2019, DCIS agents conducted surveillance at the Thompson Lane address and observed a white Chevrolet Silverado and a Black Chevrolet Malibu parked directly outside of the entrance to Suite 2. The Silverado is currently registered to Troy Chauvin, and the Malibu is currently registered to Trinity Cuevas and Troy Chauvin.

30.     **Am-Met** began bidding on and obtaining DLA contracts in 2018. **Am-Met** received a total of 10 DLA contracts during February through October 2018. The total value of these contracts is $88,436. A review of DLA contracts also revealed that since MDS' debarment, JBL Systems Solutions LLC (JBL) has also began selling **Am-Met's** parts to DLA. DLA is currently pulling **Am-Met's** parts from stock for testing – both parts sold directly by

11

**Am-Met** and parts sold indirectly through JBL. A review of several of the **Am-Met**'s bids for the above contracts revealed the bids were submitted by Rex Larue. In some bids **Am-Met** used the email address of ammetcorp@gmail.com; in others, **Am-Met** used the email address of ammetqra@gmail.com.

31.     On December 20, 2018, I reviewed a Certificate of Competency (CoC) Application (Attachment) that **Robert Klein**, the purported Owner of **Am-Met**, submitted to the Small Business Administration (SBA) in June 2018. **Am-Met** submitted the CoC Application to the SBA after DLA Troop Support (TS) determined that **Am-Met** was not responsible enough to receive the contract for DLA TS solicitation SPE8EF-17-T-3027, valued at $122,400, for wheel-track chocks. According to a CoC determination letter issued by the SBA to **Am-Met** in response to **Am-Met**'s application, the SBA determined that **Am-Met** "did not demonstrate the requisite responsibility necessary to undertake the prospective contract." In the letter the SBA made the following significant points: The financial information submitted by **Am-Met** with its CoC application was either unreliable or inconclusive, and DCMA's pre-award survey found **Am-Met's** production capabilities were unsatisfactory.

32.     In **Am-Met's** CoC application package was an Information for Small Business Size Determination form completed by **Robert Klein**. This form included the following pertinent information on **Am-Met**:

   a.   The 100% Owner of **Am-Met** is **Robert Klein**, who is also the President of the company.

   b.   The phone number, email address, and physical address listed for **Klein** are (769) 390-4000, ammetengineering@gmail.com, and 166 Thompson Rd., Suite 2,

Houma, LA 70363. The business address for **Am-Met** is 212 Gemini Ct., Houma, LA 70363.

      c. **Am-Met** produces two major products: motor vehicle parts (75%) ad valves and fittings (25%).

33.     Also in **Am-Met**'s CoC application package was **Am-Met**'s actual Application for CoC, completed by **Klein** on June 6, 2018. This application included the following pertinent information:

      d. **Am-Met's** President is listed as **Robert Klein**. **Am-Met's** address and phone number are listed as 212 Gemini Ct., Houma, LA 70363, and (985) 709-0626.

      e. A Point of Contact listed at **Am-Met's** address is "Troy".

      f. The total number of employees listed for **Am-Met** is eight.

      g. Cash on hand in **Am-Met's** bank account is listed as $70,113.

      h. **Robert Klein** is listed as the 100% owner of **Am-Met** and his net worth is $1.16 million.

34.     Also included in **Am-Met's** CoC application was **Am-Met's** Articles of Incorporation, reflecting that the company was formed in Louisiana on December 27, 2016. Rex Larue is listed as the company's Registered Agent and Director. **Robert Klein** is listed nowhere in **Am-Met's** Articles of Incorporation.

35.     Also included in **Am-Met's** CoC application was **Am-Met's** 2017 tax return. The return was self-prepared by **Robert Klein** on June 10, 2018. The return includes the following pertinent information on **Am-Met**: **Am-Met's** gross receipts were $1.65 million, gross profit was $731K, ordinary business income (after deductions) was $20K, and the business is described as a manufacturer of vehicular components.

36.     During the January 9, 2019 interview of two former **MDS** employees, agents also learned that **Klein** emailed the employees from multiple different email accounts about **MDS** business.  These email accounts included garvinidinc@gmail.com and militarydefensesystemsinc@gmail.com.  They also stated that **Klein** stored company documents on Google Drive's cloud service.

37.     On February 28, 2019, DCIS and Internal Revenue Service, Criminal Investigations (IRS CI), agents executed a federal search warrant at 621 Bonita Drive, Chalmette, LA 70043, a machine shop used by **Amos** and **Klein** for many years for **Klein's** various companies, most of which have been debarred at some point by DLA.  Among other evidence, at this location agents found hundreds of parts imprinted with the names of various companies owned by **Klein** that had debarred by DLA for selling defective parts for the U.S. military.  Numerous parts were imprinted with the name and cage cade of **Klein's** first known company that he used to defraud DLA – JN&N Inc. – which was debarred by DLA in December 2003.  On one of the office walls was a list of **Am-Met** Gmail addresses, on most of which search warrants have already been served.  Two additional **Am-Met** Gmail addresses of which the investigative team was unaware were ammett2324@gmail.com and ammetshipping@gmail.com.

38.     On February 28, 2019, DCIS agents interviewed a DCMA QAR in the New Orleans area who was the primary QAR for **Am-Met** during approximately September 2017 through January 2019.  Subsequent to the interview, the QAR provided a DCIS agent emails and other documents sent to him by Rex Larue, the purported owner of **Am-Met**.  Rex Larue would never meet the QAR in person and the QAR found this odd.  One such document was a Certificate of Conformance (CoC) that certified raw materials provided by Precision Metals Inc.

14

to **Am-Met** for a DLA L&M contract met the contract specifications; Rex Larue emailed this to the QAR on August 31, 2018. The email address for Precision Metals on this CoC is precisionmetalscorp@gmail.com and Precision Metals' physical address on the CoC is 210 Beulah Ave, Suite B, Tylertown, MS 39667. During the search warrant at 621 Bonita Drive, DCIS agents interviewed **Amos**, who acknowledged that **Klein** owned both **Am-met** and **Precision Metals**. This is corroborated by the fact that Klein opened a 2nd "**AmMet Corp**" in Mississippi (the first was incorporated in Louisiana) in October 2017; the address for **AmMet Corp** in the Articles of Incorporation is the exact same as Precision Metals' address on the CoC. Based upon these facts, it appears that **Klein** wrote a CoC for himself certifying that raw materials met the contract specifications, which he needed to provide the QAR in order for the QAR to accept parts on behalf of DLA.

39.     Similarly, at the QAR's request, "Rex Larue" sent him the PO from **Am-Met** to Precision Metals for the same raw materials for which the CoC was later issued. This PO had an email address for Precision Metals of precisionmetalsinc@gmail.com. In the chain of emails that contained the PO also was an Am-Met email address of ammettc1@gmail.com.

40.     On March 7, 2019, an agent served preservation letters on Google, Inc., which acknowledged receipt. In general, an email that is sent to a Google, Inc. subscriber is stored in the subscriber's "mail box" on Google, Inc. servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google, Inc. servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google, Inc.'s servers for a certain period of time.

### BACKGROUND CONCERNING EMAIL

41.    In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public. Google, Inc. allows subscribers to obtain email accounts at the domain name gmail.com, like the email account[s] listed in Attachment A. Subscribers obtain an account by registering Google, Inc. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

42.    A Google, Inc. subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google, Inc. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

43.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information

16

can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

44. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

45. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

46.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

18

## **CONCLUSION**

47.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Delia McMullen
Special Agent
Defense Criminal Investigative Service

Subscribed and sworn to before me on March 12                , 201 9

Honorable Kimberly A. Jolson
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with email accounts

precisionmetalscorp@gmail.com, precisionmetalsinc@gmail.com, ammettc1@gmail.com,

ammett2324@gmail.com, and ammetshipping@gmail.com that are stored at premises owned,

maintained, controlled, or operated by Google, Inc., a company headquartered at Google, Inc.,

Attn: Custodian of Records, 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.**    **Information to be disclosed by Google, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on March 7, 2019, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all emails associated with the accounts from January 1, 1997 through the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18, United States Code, Section 1001 (making false statements), Section 1343 (wire fraud), Section 287 (making a false or fraudulent claim against the U.S), and Section 38 (fraud involving aircraft parts), those violations involving **Am-Met Corporation, Military Defense Systems Inc. (MDS)**, **Robert O. Klein**, **John Amos** and other known and unknown persons and companies, including those previously identified companies having been debarred by DLA, including

- Precision Metals Inc.
- Adam Wolfe, Bryan Wolfe, and Donald Wolfe and Chad Myers, Rex Larue, Trinity Cuevas and Troy Chauvin (associated with MDS and Am-Met);
- JBL Systems Solutions LLC, including Joseph Lazzario;
- JN&N Inc., Advanced Technology, Fluid Devices Ltd., Advance Technologies Ltd., and Charles T. Pace;
- Transwestern Resources Corporation, George Pattison, Advanced Technologies, Sunpool Manufacturing Company, Sara Steihl, Robert Steihl, Linda Lee, JN&N, and Charles Pace;
- Eurometals SA Ltd., Skyvara Foundry Ltd., Herbert Harvey, Claude Bernard, Richard Skyvara, and Bernard Skyvara;
- Zero Recoil Factors Inc., Metal and Machine Institute Inc., and TNT Engineering Ltd.;
- Omni Tec LLC and Nolen Materne;
- Burch Technical Institute, Cameron Duchman, and Clinton Gibson;
- Highlands Manufacturing Institute and William Teach;
- Stealth Equipment Instructor Inc. and William Smith;
- Ace Service and Supply Corp, Howard Stein, Eric Stein, and Mark Gold;
- Sydabon Mfg. Inc., Bena Lobe, Leonard Lobe, Dalton Reme, Russel Thurston, Lela Thurston, Sydabon Manufacturing Co., and Debra Namias;

and occurring after January 1, 1997, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

3

- Information related to U.S. Department of Defense, Defense Logistics Agency contracting, to include but not limited to, solicitations, bids/quotes, purchase orders/contracts, DFAS or other payment records, inspection records or results including any drawings or certifications whether conducted in-house or by a government agency such as DCMA or a private third-party; traceability documents or requests for traceability; the ordering or manufacturing of any parts provided to the DoD including any receipts, invoices, correspondence with suppliers; the shipping of parts from suppliers and to the DoD.

- Information related to the creation, ownership, registration, corporate meeting minutes, tax records and annual reports, employees or dissolution of such companies; the extent of their dealings with the DoD and any of its agencies to include any records of CAGE code or SAM applications or registrations, pre-award survey documents, quality manuals and correspondence with DoD;

- Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

- Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

- The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Google, Inc., and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google, Inc. The attached records consist of _____ _____. I further state that:

a.        all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, Inc., and they were made by Google, Inc. as a regular practice; and

b.        such records were generated by Google, Inc.'s electronic process or system that produces an accurate result, to wit:

1.        the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google, Inc. in a manner to ensure that they are true duplicates of the original records; and

2.        the process or system is regularly verified by Google, Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

5

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____       _____
Date                                    Signature